09-1457-cr
United States v. Broxmeyer

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: May 19, 2010          Decided: August 3, 2010)

Docket No. 09-1457-cr

- - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

                Appellee,

        - v.-

TODD J. BROXMEYER,

                Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - -x

        Before:        JACOBS, Chief Judge, MINER and WESLEY,
                       Circuit Judges.

        Todd Broxmeyer, convicted in the United States District Court for the Northern District of New York (McAvoy, J.), contests the sufficiency of the evidence as to both the production of child pornography (Counts One and Two) and the transportation of a minor across state lines with the intent to engage in criminal sexual activity (Count Four); he also raises an as-applied challenge to the constitutionality of

the statute criminalizing the production of child pornography. No appeal is taken as to the other counts of conviction. We agree as to insufficiency; reverse the convictions on Counts One, Two, and Four; and remand for re-sentencing. Judge Wesley dissents as to Count Four in a separate opinion.

JAMES P. EGAN (Alexander Bunin, Lisa A. Peebles, on the brief), Federal Public Defender's Office, Syracuse, New York, for Appellant.

NATHANIEL J. DORFMAN (Miroslav Lovric, on the brief), for Richard S. Hartunian, United States Attorney's Office for the Northern District of New York, Albany, New York, for Appellee.

DENNIS JACOBS, Chief Judge:

Todd Broxmeyer, convicted in the United States District Court for the Northern District of New York (McAvoy, J.), challenges the sufficiency of the evidence to support his convictions for [i] production of child pornography and [ii] transportation of a minor across state lines with the intent to engage in criminal sexual activity. He also raises an as-applied challenge to the statute criminalizing the

2

production of child pornography.

Broxmeyer, a 37-year-old field hockey coach, entered into a sexual relationship (legal under state law) with a 17-year-old player.  The two counts alleging production of child pornography are premised on two photos (one per count) that the girl took of herself.  He was found to have induced her to produce them; but while there is evidence that he encouraged her to take photographs of that kind, and that she took several with his encouragement, there is no evidence that he encouraged her to take the two photos specified in the two counts of conviction.

The transportation count is premised on the round-trip travel of a 15-year-old field hockey player from her home in Pennsylvania to a field hockey practice in New York where Broxmeyer was coach.  He drove her back home, stopping en route for a sexual encounter with her before crossing the state line.

We agree with Broxmeyer on the sufficiency challenges; reverse the convictions on Counts One, Two, and Four; and remand for re-sentencing on the counts of conviction as to which no appeal was taken (attempted production of child pornography and possession of child pornography).

3

**I**

Broxmeyer was for some years a field hockey coach to girls 14-to-18 years old. During this career, Broxmeyer engaged in sexual relationships with several of his players, some of whom were younger than 18. These relationships involved both physical acts and "sexting" (defined here to mean the exchange of sexually explicit text messages, including photographs, via cell phone).

In September 2008, Broxmeyer was convicted by a jury on all counts of a five-count indictment, of which Counts One, Two, and Four are at issue on this appeal:

- **Counts One and Two**: Production of child pornography, in violation of 18 U.S.C. § 2251(a);

- **Count Three**: Attempted production of child pornography, in violation of 18 U.S.C. § 2251(a), (e);

- **Count Four**: Transportation of a minor across state lines with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a); and

- **Count Five**: Possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).[1]

---

[1] In addition, Broxmeyer pled guilty to state charges. See Broxmeyer Sentenced on Broome County Charges, Action News, WBNG12, May 20, 2009, available at http://www.wbng.com

4

At the close of the government's case-in-chief, Broxmeyer moved pursuant to Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal on Counts One, Two, and Four. The district court denied the motion as to Count Four and reserved judgment as to Counts One and Two. A week after his conviction, Broxmeyer moved pursuant to Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal on all five Counts or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). By written order dated November 4, 2008, the district court denied the motion in full.

On April 2, 2009, the district court sentenced Broxmeyer to concurrent terms of 360 months' imprisonment on each of Counts One, Two, and Three; 480 months on Count Four; and 120 months on Count Five. (The advisory Guidelines sentence was life imprisonment.)

In Point II, we review the sufficiency of the evidence to support the convictions for production of child pornography. In Point III, we review sufficiency as to the transportation Count.

---

/news/local/45512052.html.

5

## II

Counts One and Two allege that Broxmeyer produced two sexually explicit pictures (one per Count) that a 17-year-old field hockey player took of herself.

## A

Broxmeyer met A.W. in 2005, while he was coaching at a field hockey camp in New England.[2] Over the next few years, and through her senior year in high school, A.W. attended Broxmeyer's practices at field hockey camps across Pennsylvania, New Jersey, and New York.

Beginning in the spring of 2007 (and continuing until his arrest in December 2007), Broxmeyer and A.W.--who was then 17--began a consensual sexual relationship, legal under New York's statutory rape law.[3] The two engaged in sexting as well as physical sex.

They exchanged images as follows. They used their cell

---

[2] Pursuant to Federal Rule of Criminal Procedure 49.1(a)(3), the parties refer to the girls (and their parents) by their initials. We will do the same here.

[3] The age of consent under New York law is 17. N.Y. Penal Law § 130.05(3)(a); see also id. §§ 130.25, 130.40. However, for purposes of 18 U.S.C. § 2251, A.W. was a "minor" under federal law during her sexual relationship with Broxmeyer. 18 U.S.C. § 2256(1).

phones to take pictures of themselves engaged in sexual acts with each other. Broxmeyer texted A.W. a picture of his arousal. Broxmeyer texted A.W. sexually explicit pictures of other field hockey players, including one of several girls in their underwear, who were arranged in a pyramid. Broxmeyer showed A.W. several sexually explicit pictures of field hockey players that he had saved to an internet photo album. He challenged A.W. to acquire naked pictures of other field hockey players, and A.W. obliged. A.W. also texted Broxmeyer explicit photos of herself. Broxmeyer never expressly asked A.W. to send him pictures of herself, but he did tell her that he liked them and that she was doing something nice by sending them to him.

Counts One and Two relate to two photos--one per Count --that A.W. took of herself and texted to Broxmeyer. The first ("Photo 1") shows A.W. from the neck down, naked, touching her private parts. The second ("Photo 2") shows A.W. using a handheld showerhead to spray water between her legs. But there is no evidence as to when the two photos at issue were taken--i.e., produced--or how or whether their production fits into the series of other communications and exchanges.

**B**

The federal statute criminalizing the production of child pornography, 18 U.S.C. § 2251(a), provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . shall be punished . . . if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce . . . if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means . . . .

Section 2251(a) applies only to the actual *production* of child pornography; other statutes--not charged in this case --proscribe distribution. Cf. United States v. Dauray, 215 F.3d 257, 263 (2d Cir. 2000) (explaining that 18 U.S.C. § 2252(a)(3) prohibits the sale or possession with intent to sell child pornography and § 2252(a)(2) prohibits the receipt or distribution of child pornography). To secure a conviction under § 2251(a), the government must prove beyond a reasonable doubt that: "(1) the victim was less than 18 years old; (2) the defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a

8

visual depiction of that conduct; and (3) the visual depiction was produced using materials that had been transported in interstate or foreign commerce." United States v. Malloy, 568 F.3d 166, 169 (4th Cir. 2009).

Broxmeyer does not contest the sufficiency of proof as to the first and third elements: A.W. was 17 when she took Photos 1 and 2; and the cell phone she used to take them was made in South Korea. His challenge is to the sufficiency of the evidence on the second element.

"A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted). We must consider the evidence "in the light most favorable to the Government" and draw "all permissible inferences" in its favor. Id. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Jackson, 335 F.3d at 180 (explaining that a judgment of acquittal is proper "only if the evidence that the defendant committed the crime alleged

9

was nonexistent or meager" (internal quotation marks and ellipsis omitted)). At the same time, a conviction cannot stand if it is based on mere speculation or guesswork. See United States v. Thai, 29 F.3d 785, 818-19 (2d Cir. 1994).

## C

The decisive question here is whether the prosecution proved beyond a reasonable doubt that Broxmeyer persuaded, induced, or enticed A.W. to take Photos 1 and 2. The terms "persuade," "induce," and "entice" are not defined in § 2251(a), but they are "words of common usage that have plain and ordinary meanings," United States v. Gagliardi, 506 F.3d 140, 147 (2d Cir. 2007), and we look to the dictionary for their common definitions, see VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 187 (2d Cir. 2010). "Persuade," "induce," and "entice" are in effect synonyms. See The Random House Dictionary of the English Language 1076 (unabridged ed. 1971). The idea conveyed is of one person "lead[ing] or mov[ing]" another "by persuasion or influence, as to some action, state of mind, etc." or "to bring about, produce, or cause." Id. at 726 (defining "induce"); see also id. at 476 (defining "entice" as "to draw on by

10

exciting hope or desire; allure"); id. at 1076 (defining "persuade" to mean "to prevail on (a person) to do something, as by advising, urging, etc." or "to induce to believe; convince").

These are words of causation; the statute punishes the cause when it brings about the effect. Sequence is therefore critical. The facts of this case require us to belabor the obvious: Broxmeyer could only persuade, induce, or entice A.W. to take Photos 1 and 2 if his persuasion, inducement, or enticement came *before* she took them. Broxmeyer's counsel failed to present this argument to the district court and conceded at oral argument that he raised it for the first time in his reply brief on appeal. Generally speaking, such arguments are deemed forfeited. See Local 377, RWDSU, UFCW v. 1864 Tenants Ass'n, 533 F.3d 98, 99 (2d Cir. 2008); McCarthy v. S.E.C., 406 F.3d 179, 186 (2d Cir. 2005). However, because "manifest injustice" would result if we were to invoke that rule here, see McCarthy, 406 F.3d at 186-87, we go to the merits of this contention.

All that the record shows on this sequencing point is that A.W. turned 17 in January 2007; she took Photos 1 and 2 when she was 17; and she began a sexual relationship with

11

Broxmeyer in the spring of 2007. There is nothing to tie Broxmeyer to Photos 1 and 2 except that he received them when she transmitted them. His receipt may or may not have violated § 2252--but that statute was not charged in the indictment. As to the *production* of Photos 1 and 2--which *is* charged--there is no evidence that Broxmeyer inspired it. For all the record evidence shows, Photos 1 and 2 could have been taken in the early part of 2007, for an audience other than Broxmeyer, or for A.W. alone; or during the preliminary stage of their encounter when she was flirting with him on a basis not yet reciprocated; or later in 2007, while in the course of her sexual relationship with Broxmeyer. Photos 1 and 2 were taken in one of these three periods, but as to when--and whether they were taken before or after he solicited photos of her--one can only guess.

The government adduced no evidence on this point. At trial, the government questioned A.W. at length (she was a government witness, at least nominally); but she was not asked when in the sequence of events she took Photos 1 and 2. The jury was left to speculate or guess. See Thai, 29 F.3d at 818-19.

As to sequence, the government fudged. It adduced

12

evidence that during the sexual relationship: Broxmeyer took explicit photographs of the couple having sex; he challenged A.W. to take naked pictures of other field hockey players; A.W. and Broxmeyer took sexually explicit pictures of themselves and sent them to one another while sexting; Broxmeyer told A.W. that he thought the naked pictures A.W. sent of herself were "nice" and "hot"; and Broxmeyer made A.W. feel as though she "did something right" by sending him naked pictures (either of her or other girls; that is unclear). The government also relies heavily on A.W.'s testimony that there were approximately 15 pictures "taken during the entire time that [she] and Todd Broxmeyer engaged in any kind of sexual act." Gov't App. at 53. But none of this evidence is specific to Photos 1 and 2. Some of the evidence reflects encouragement or incitement by Broxmeyer that was presumably proscribed by § 2251(a); but there is no evidence that Photos 1 and 2 were among those taken at his behest.

Our analysis in United States v. Sirois, 87 F.3d 34 (2d Cir. 1996), is not to the contrary. There, the defendant himself took the pornographic pictures, and he was convicted of "using" the minors in violation of § 2251(a). In

13

rejecting the sufficiency challenge in that case, we held that "a defendant can be found to have 'used' a minor to produce child pornography if the minor serves as the subject of the illicit photographs *taken by the defendant*." Id. at 43 (emphasis added). Here, the photographs were taken *by A.W.*, not Broxmeyer, and (to repeat) there is no evidence he induced her to take them.

To the extent the district court concluded that the jury could *infer* that A.W. took Photos 1 and 2 at Broxmeyer's prodding, no such inference was available: The government presented no evidence bearing on when Photos 1 and 2 were taken. In a footnote to its decision and order denying Broxmeyer's post-verdict motion, the district court observed that "[t]here was testimony at trial that [Broxmeyer] took photographs while engaging in sexual acts with A.W." Def.'s App. at 147. This is true, but irrelevant. Neither Photo 1 nor Photo 2 showed Broxmeyer at all. Presumably there is a reason the government did not premise the § 2251(a) counts on the photographs that Broxmeyer took of him and A.W. having sex; but for present purposes, all that matters is that it did not do so. Whether Broxmeyer took photographs of A.W. having sex (or, indeed, took sexually explicit

14

photographs of other under-18 girls) has no bearing on the sole decisive issue of whether he persuaded, induced, or enticed A.W. to produce Photos 1 and 2.

The district court also cited evidence that Broxmeyer persuaded, induced, or enticed A.W. "*to send* sexually explicit pictures of herself to him."  Def.'s App. at 147 (emphasis added).  As we have explained, however, § 2251(a) applies only to the *production* of child pornography.  Distribution is proscribed by § 2252, which was not charged.  Accordingly, a § 2251(a) conviction cannot be premised on the fact that Broxmeyer persuaded, induced, or enticed A.W. *to send* him her pornographic self-portraits.

For these reasons, we hold that the government adduced insufficient evidence on which to sustain a conviction under 18 U.S.C. § 2251(a); accordingly, we reverse the convictions on Counts One and Two.  In light of this holding, Broxmeyer's as-applied commerce clause challenge to § 2251(a) has no further bearing on the outcome of this case.  However, because the point was closely briefed by the parties and studied by the Court, we impart our view, now dicta, that the argument fails in light of the Supreme Court's decision in Gonzalez v. Raich, 545 U.S. 1 (2005).

15

**III**

Count Four involves Broxmeyer's conviction for transporting then 15-year-old K.M. across state lines for the purpose of engaging in illegal sexual conduct with her.

**A**

K.M. was another of Broxmeyer's field hockey players. She lived in Pennsylvania, but on Saturdays K.M. and a friend would often attend Broxmeyer's practices in Binghamton, New York. Usually, they would be driven to and from practice by K.M.'s father (L.M.), or by the mother of her friend.

Consistent with this pattern, early in December 2007, K.M. told her father that she wanted to attend practice on Saturday, December 8, in New York. Originally, the plan was for L.M. to drive her to practice; she would spend the night at the home of another friend, J.B., who also planned on attending that practice; and L.M. would return to pick up K.M. on the afternoon of Sunday, December 9--he could not pick her up Sunday in the morning because of a prior family commitment. The plan seems to have changed when J.B.'s

parents offered to drive K.M. half-way home, to a point where L.M. would meet them and take K.M. the rest of the way home.

Later that week, Broxmeyer learned that K.M. was coming to practice and that she would spend the night at J.B.'s house. Broxmeyer offered to drive K.M. home--from New York to Pennsylvania--on Sunday morning on his way to a practice scheduled for later that afternoon in New Jersey. Father and daughter consented, although L.M. maintained that he could return to pick up K.M. in New York Sunday in the afternoon.

Events proceeded in accordance with the last of these three arrangements: L.M. drove K.M. to practice in New York on Saturday, December 8; K.M. stayed the night at J.B.'s home; and early Sunday morning, Broxmeyer picked up K.M. to drive her home to Pennsylvania. Shortly after picking her up (and before crossing the line from New York to Pennsylvania), Broxmeyer stopped at a local sports facility to get some equipment that he needed for his New Jersey practice. At his request, K.M. went inside to help him carry the equipment. Once inside, Broxmeyer caused K.M. to perform oral sex on him.

17

Broxmeyer then drove K.M. from the facility (in New York) to her home (in Pennsylvania) and told her not to tell anyone about the oral sex.[4]

**B**

Title 18, section 2423(a) of the United States Code provides:

> A person who knowingly transports an individual who has not attained the age of 18 years in interstate . . . commerce . . . with intent that the individual engage in . . . any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

To obtain a conviction under § 2423(a), the government must prove beyond a reasonable doubt that the defendant: "(1) knowingly transported a minor across state lines, (2) with the intent to engage in sexual activity with the minor, and (3) that the minor was under eighteen at the time of the offense." United States v. Chambers, 441 F.3d 438, 450 (6th Cir. 2006).

---

[4] Receiving oral sex from a 15-year-old--regardless of whether it was consensual--is unlawful under New York state law. See N.Y. Penal Law § 130.40(2) ("A person is guilty of [a] criminal sexual act in the third degree when . . . [b]eing twenty-one years old or more, he or she engages in oral sexual conduct . . . with a person less than seventeen years old.").

18

Relevant to this appeal, § 2423(a) is also violated by aiding and abetting the transportation of a minor across state lines. United States v. Holland, 381 F.3d 80, 88 (2d Cir. 2004); see also 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."). Thus a defendant who causes a minor to be transported across state lines can be convicted under § 2423(a). Holland, 381 F.3d at 88.

K.M. took two interstate rides: from Pennsylvania to New York on Saturday, December 8; and from New York to Pennsylvania on Sunday, December 9. In denying Broxmeyer's motion for a judgment of acquittal on Count Four, the district court focused only on the first ride, under the aiding and abetting theory of § 2(b). Def.'s App. at 149 ("[T]here was ample evidence upon which the jury could have reasonably concluded beyond a reasonable doubt that [Broxmeyer's] purpose in having K.M. transported, or *causing* her to be transported, *to New York* was to engage in sexual acts with her." (emphases added)).

We consider both legs of the trip.

19

**C**

Pennsylvania to New York. K.M.'s attendance at the December 8 practice was not brought about by Broxmeyer. She was going to attend practice that Saturday, as she had done on prior occasions; her attendance was not contingent on Broxmeyer's offer to drive her home on December 9. Her father testified that although it would have been "difficult" for him to pick up K.M. on the Sunday morning, "that wouldn't be a big issue as long as [K.M.'s friend] wouldn't mind keeping [K.M.] to the afternoon. . . . Didn't seem like there was a big issue with that." Def.'s App. at 86. He had "no reservations" about picking her up on Sunday afternoon: "I *always* had upon it myself [sic] I was coming up there in the afternoon [Sunday]." (emphasis added). Id. at 99, 102. So, he testified, "I was either going to come all the way [to pick K.M. up] or [Broxmeyer] had offered to drive her back down." Id. at 100.

The record thereby contradicts the government's contention--advanced without corresponding citations to the record--that Broxmeyer *caused* K.M. to travel from Pennsylvania to New York because, absent his offer to do so,

20

she would not have come to his practice that Saturday.[5]

The government also contends that L.M. "was unavailable to retrieve K.M. from New York on the morning of December 9, 2007." Gov't Br. at 49. This is true as far as it goes. But L.M. testified that he could have picked her up on Sunday *afternoon*. An afternoon pickup would not have prevented K.M. from attending the practice: She was planning on an afternoon return before Broxmeyer offered to save her father the trip.[6]

Accordingly, the Pennsylvania-to-New York trip cannot be

---

[5] The government argues, without record citation: "Without Broxmeyer's agreement to transport K.M. back from New York to Pennsylvania on December 9, K.M.'s father would not have brought his daughter to New York on December 8," Gov't Br. at 50; "there was no other mechanism for K.M. to be brought back to Pennsylvania on the morning of December 9," id. at 51; "Broxmeyer's commitment [to drive K.M. home on Sunday] 'put in motion' K.M.'s travel from Pennsylvania to New York by persuading her father to bring K.M. to New York on December 8," id. at 50; and, "even though Broxmeyer was not behind the wheel on December 8, 2007, he 'caused' [within the meaning of 18 U.S.C. § 2(b)] the transportation of K.M. from Pennsylvania to New York on that date," id. at 48.

[6] At oral argument in this Court, the government added another permutation: that when father and daughter left their house in Pennsylvania for the practice in New York on Saturday, they did so *knowing* that Broxmeyer was going to drive K.M. home the following day, and in this way Broxmeyer caused her trip across the state line. This argument conflates causation with knowledge.

21

the basis for Broxmeyer's § 2423(a) conviction.[7]

New York to Pennsylvania.  On their way from New York to Pennsylvania, but while still in New York, Broxmeyer had K.M. perform oral sex on him, in violation of New York law. The decisive question (disputed by the parties only in the footnotes in their appellate briefs) is whether a § 2423(a) conviction can lie where the unlawful sexual act occurs *before* the crossing of state lines, and where there is no evidence of an intent to commit a sexual act when state lines were crossed.  We hold that it cannot.

The plain wording of the statute requires that the mens rea of intent coincide with the actus reus of crossing state lines.[8]  Accord David J. Langum, Crossing Over the Line:

---

[7] The dissent relies in part on K.M.'s testimony that her parents could not pick her up from practice on Sunday, December 9.  Dissenting Op. at 9.  But she reached this understanding for the first time only *after* she and her father arrived at the practice on December 8: "Q. When did it come into play that [Broxmeyer] would give you a ride? A. The first time I heard was when we got up there on December 8 . . . ."  Def.'s App. at 116.  K.M.'s testimony, considered in its entirety and in view of L.M.'s testimony, is too "meager" to sustain a conviction on Count Four.  Cf. Jackson, 335 F.3d at 180 (internal quotation marks omitted).

[8] The only relevant actus reus is the crossing of state lines; § 2423(a) is a crime of intent, and a conviction is entirely sustainable even if no underlying criminal sexual

22

Legislating Morality and the Mann Act 4 (Univ. of Chicago Press 1994) (describing a precursor to § 2423(a) and noting that "the violation was complete upon the woman's crossing of the state line if the man *at that time* merely *intended* that the purpose of her travel be for any 'immoral purpose'") (first emphasis added)); cf. Morissette v. United States, 342 U.S. 246, 251-52 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand . . . ."); United States v. Desena, 287 F.3d 170, 181-82 (2d Cir. 2002) (rejecting--on the facts--defendant's argument that the "coincidence of the mens rea and actus reus elements of the offense" was not proven because the defendant did not know of the conspiracy to assault until *after* he took the overt act leading to conspiracy liability).

The Eleventh Circuit's decision in United States v. Hersh, 297 F.3d 1233 (11th Cir. 2002), is consonant with our reading of the statute. There, the defendant was convicted of violating 18 U.S.C. § 2423(b), which then punished a

---

act ever occurs. Accord United States v. Griffith, 284 F.3d 338, 351 (2d Cir. 2002) (explaining that a defendant should be "on notice that he is [violating § 2423(a)] when he transports an individual of any age in interstate commerce for the purpose of prostitution").

"person who travels in interstate commerce . . . *for the purpose of engaging in any sexual act* . . . with a person under 18 . . . ." Hersh, 297 F.3d at 1245 (quoting the statute). The court explained, in a passage relevant here, that "[t]he government was required to prove, and did establish, that [the defendant] had formed the intent to engage in sexual activity with a minor *when he crossed state lines*." Id. at 1246 (emphasis added). Thus, for § 2423(b), intent was ascertained as of the moment the state line was crossed. Section 2423(a) operates in the same way.

The district court charged the jury consistent with our reading of the statute. See Tr. at 375, Mar. 11, 2009 (explaining that to convict on Count Four, the jury must find that the government proved beyond a reasonable doubt "[f]irst, that the defendant transported an individual across a state line or border; [s]econd, that the defendant did so with the intent that the individual engage in sexual activity . . . .").

**CONCLUSION**

For the foregoing reasons, we reverse the convictions on Counts One, Two, and Four, and remand for re-sentencing.

WESLEY, *Circuit Judge*, dissenting:

I dissent from the majority's holding as to Count 4, in which Todd Broxmeyer was convicted by a jury of aiding and abetting the transportation of a 15-year-old girl over state lines with the intent to engage in unlawful sexual activity with her.

This case illustrates the importance of the institutional role that we play in a direct appeal challenging the sufficiency of the evidence supporting a criminal defendant's conviction. That role requires a delicate balance. On the one hand, we must respect the jury's essential place in our criminal justice system; that respect requires us to defer to a jury's conclusions regarding the evidence at a trial. In other words, we "may not usurp the role of the jury by substituting [our] own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (internal quotation marks omitted). On the other hand, fundamental principles of justice require that a jury's decision to convict must rest on competent evidence adduced by the government at trial, and we must be satisfied that the evidence is capable of establishing the defendant's

guilt beyond a reasonable doubt.  *See id.*  In short, we must accept a jury's assessment of actual evidence, but not its speculation, when reviewing the imposition of criminal sanctions.

Based on these principles, I agree with the majority that there was insufficient evidence to support Broxmeyer's conviction as to Counts 1 and 2.  Vacatur is appropriate because these Counts relate to two sexually explicit photographs that A.W. took of herself, and there is *no evidence* in the record regarding when during the year 2007 those specific images were produced.

But the same cannot be said with respect to Count 4.  To obtain a conviction on this Count, the government was required to prove beyond a reasonable doubt that:  (1) Broxmeyer transported K.M., or caused her to be transported, over the Pennsylvania-New York border, (2) while intending to engage in illegal sexual activity with her, and (3) that K.M. was less than eighteen years old at the time.  *See* Op. at 19.  With respect to the first element, which is the only one in dispute, the government was permitted to seek a conviction based on an aiding and abetting theory.  *See id.*

Our role here is clear:  We must assess the evidence

2

regarding why it is that L.M. drove his daughter from Pennsylvania to New York on the morning of December 8, 2007.[1] The question for the jury was whether the government proved, beyond a reasonable doubt, that Broxmeyer caused L.M. to transport K.M. across state lines by promising to bring her home to Pennsylvania the next day.  The jury answered "yes" to that question.  The only issue for us, then, is whether there was sufficient evidence to support its conclusion.  I would answer that question in the affirmative.

One of the most important portions of L.M.'s testimony regarding this issue came during his direct examination.  I quote it here in full:

---

[1] I agree with the majority that it is appropriate to examine both "legs" of K.M.'s trip on December 8-9, 2007, Op. at 20, and that the government could not satisfy its burden by relying on the evidence relating to her return to Pennsylvania, *see id.* at 22-25.  The text of 18 U.S.C. § 2423(a) requires that the requisite *mens rea* be formed at or prior to the time of the transportation in question.  The jury could infer from the fact that Broxmeyer forced K.M. to perform oral sex on him as soon as he was alone with her — a circumstance he brought to be by taking her to an empty sports complex on the morning of December 9 — that he caused her to be transported to New York for that purpose.  But that inference, which is based on the sequence and proximity of the transportation to the illegal sex act, is not available when the sex act precedes the transportation in question.  *See* Op. at 23.  As such, the return leg of K.M.'s trip cannot serve as the basis for defendant's conviction on Count 4.

3

Q    What happened on that weekend as far as your availability to transport [K.M.] back and forth or [K.M.] not being able to get back and forth?

A    Earlier in the week [K.M.] expressed interest in going up [to New York] for a practice session, and one of her friends from the team . . . offered to put her up for the night, so I would just need to drop her off on Saturday midday after her other responsibilities.  She played for another club team down in . . . Pennsylvania, called Excalibur, so she had practice in the morning, and we came up in the afternoon on that particular day, but earlier in the week — [K.M.] expressed interest in coming up, but my issue was really can't [sic] spend the night because my son, who's 9, was serving his First Holy Communion on Sunday, December 9.  Actually, it was a practice [for the Holy Communion ceremony] but it was required and mandatory for the parents to partake in the service that morning, so it would be difficult for me to come up and pick her up in the morning.

I said that wouldn't be a big issue as long as [K.M.'s friend] wouldn't mind keeping you to the afternoon and I can come up maybe mid to late afternoon.  Didn't seem like there was a big issue with that.  But I guess as things developed in the course of that week, Todd Broxmeyer offered to, since he's going to be traveling down to New Jersey for a Sunday practice, that he could drop [K.M.] off at home.  Again, I believe he lived about five, ten minutes off of the exit for Pennsylvania Turnpike downtown exit.  It seemed reasonable, however reluctant that we were.

Def.'s App. at 85-87, Tr. at 205-07.

The jury could infer from this and other testimony that "earlier in the week" that began on December 3, 2007, K.M.

4

"expressed interest" in attending practice in New York on December 8 and spending that night with a friend. *Id.* at 86, Tr. at 206. At the time of the request, L.M. "said" to K.M. "that wouldn't be a big issue *as long as* [your friend] wouldn't mind keeping you to the afternoon" on Sunday. *Id.* (emphasis added). Thus, L.M.'s testimony suggested that he did *not* immediately agree to take K.M. to the practice and instead imposed a condition precedent on the trip. And there was no testimony indicating that this condition was satisfied at any time, much less in advance of Broxmeyer's intervening offer to drive K.M. home.

Specifically, L.M. went on to testify that, "as things developed in the course of that week, Todd Broxmeyer offered to . . . drop [K.M.] off at home" on the day after the practice. *Id.* L.M. thought that plan "seemed reasonable, however reluctant that we were." *Id.* at 86-87, Tr. at 206-07. L.M.'s "reluctan[ce]" did not arise out of distrust for Broxmeyer. Instead, L.M. expressed "a lot of reluctance" because the trip to New York would be too disruptive during the course of what was already going to be a busy weekend for the family. *Id.* at 88, Tr. at 208. He recalled asking K.M., "do you really want to do this, do you really need to

5

go up there?" *Id.* This initial reluctance supports the inference that L.M. had not decided to drive K.M. to practice before Broxmeyer offered to drive her home. Indeed, L.M.'s reluctance suggests a possibility that is ignored by the majority: He might have declined to take her to New York altogether in the absence of Broxmeyer's offer.

On or about December 7, 2007 — *i.e.*, "[t]he day before" the practice — Broxmeyer contacted L.M. to "confirm[]" that he would drive K.M. home on December 9. *Id.; see also id.* at 99, Tr. at 219 (L.M. testifying on cross-examination that the "[transportation] issue was days before" and that he spoke with Broxmeyer "a couple days before going up [to New York]"). The existence of this "confirmed" plan takes on added significance in light of L.M.'s testimony that he would "never drop off [his] daughter if [he] didn't know when and where she was going to be to and from." *Id.* at 99, Tr. at 219. The jury was entitled to believe L.M.'s assertion and apply it to the facts about which he was testifying. In the absence of the plan with Broxmeyer, according to L.M., he would "never" have taken K.M. to New York. Put another way, it was *because of* Broxmeyer's "confirmed" offer of a return trip that L.M. agreed to drive

6

K.M. to the practice. Therefore, a rational fact finder could conclude that Broxmeyer's offer to drive K.M. home caused L.M. to decide to bring her to New York on December 8. While L.M.'s testimony may not compel this result, our role does not permit us to resolve competing inferences supported by the record. The jury has already done that, and it has resolved them against Broxmeyer.

In an attempt to support its contrary holding, the majority takes selective quotations from L.M.'s testimony and asserts that K.M. "was going to attend practice [in New York] that Saturday, as she had done on prior occasions; her attendance was not contingent on Broxmeyer's offer to drive her home on December 9." Op. at 20. The common thread that unites each of the quotes cited by the majority is L.M.'s recollection that he was confident at the time that he would have been able to pick K.M. up on Sunday. *See id.* at 20-21. The majority infers from L.M.'s confidence — as it must, because there was no testimony to this effect — that it was inevitable from the time K.M. first made the request that L.M. was going to take her to New York. However, the jury was not obligated to adopt this mode of analysis, and the majority improperly draws inferences against the government

7

in relying on it.

The testimony quoted in the majority opinion that most supports its position that L.M. decided to take the trip before Broxmeyer's offer of return transportation was elicited during the cross-examination of L.M.:

> Q   When did the plan change from the [parents of K.M.'s friend] giving your daughter a ride back home to Mr. Broxmeyer?
>
> A   Again, that was such – in passing I was either going to come all the way up or Todd had offered to drive her back down.

Def.'s App. at 100, Tr. at 220.

Even assuming, *arguendo*, that this testimony tended to establish that L.M.'s decision to drive K.M. to New York "was not contingent on Broxmeyer's offer to drive her home on December 9," Op. at 20, nothing required the jury to accept this response from L.M., or any other portion of his testimony, at face value. *See United States v. Frampton*, 382 F.3d 213, 221 (2d Cir. 2004).  For any number of reasons, a rational juror might reject this father's recollection of his approach to that weekend, which was presented at trial from an *ex post* perspective that was likely tainted by hindsight bias resulting from the events that ultimately transpired.

8

Moreover, there was a basis in the record to justify disregarding the testimony from L.M. that suggested that Broxmeyer was irrelevant to the equation.  Specifically, L.M.'s testimony was inconsistent with testimony from K.M., who recalled these events differently during her direct examination:

> Q    And what was your understanding as to how you would get home the following day on December 9?
>
> A    Well, my parents couldn't come and get me the next day [on December 9] because my brother had First Holy Communion, so my parents asked if Todd [Broxmeyer could] bring me home and he said he could.

Def.'s App. at 108, Tr. at 228.  K.M.'s testimony sits in significant tension with L.M.'s suggestion that "[h]e had 'no reservations' about picking her up on Sunday afternoon."  Op. at 21.  As she recalled, L.M. "couldn't come" to get her on that day.  The jury could therefore infer that:  (1) in the absence of any other means for her to return home, L.M.'s initial "reluctance" would have carried the day and prevented the trip; and (2) but for Broxmeyer's subsequent offer to drive K.M. home, L.M. would not have driven her to New York on December 8.

*        *        *

In sum, the contrast between the majority's treatment of the sufficiency issues in this appeal lays bare the flaws in its analysis of Count 4.  With respect to Counts 1 and 2, there was *no evidence* regarding when the two sexually explicit photographs at issue were produced.  As a result, the jury could only speculate as to whether Broxmeyer caused A.W. to produce those photos.  Therefore, I agree that the conviction as to Counts 1 and 2 must be vacated.

With respect to Count 4, however, the majority has invaded the province of the jury to cast aside the evidence supporting its verdict.  Based on the evidence relating to the sequence of events, L.M.'s initial "reluctance" about the trip, K.M.'s testimony that her parents "couldn't" pick her up in New York, and the timing of L.M.'s communications with Broxmeyer, the jury was entitled to infer that it was Broxmeyer's offer to drive K.M. home that caused L.M. to drive her to New York.

While the government's case was not ironclad, it is an extraordinary thing to set aside a jury's verdict.  We must exercise that power sparingly, especially in the highly fact-intensive context of questions relating to causation.  With respect to Count 4, it is unnecessary to disturb the jury's verdict.  Therefore, I dissent.

10